UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| TEXAS TRAILER CORPORATION, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 3:15-CV-2453-B |
| | § | |
| NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA., | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court are Defendant National Union Fire Insurance Company of Pittsburgh, Pa.'s Motion for Summary Judgment (Doc. 20) and Plaintiff Texas Trailer Corporation's Partial Motion for Summary Judgment (Doc. 21). For the reasons that follow, the Court **DENIES** both motions **without prejudice**.

### I.

### BACKGROUND

This is an insurance coverage case in which Plaintiff Texas Trailer Corporation ("TTC") seeks to recover some of its costs incurred in defending a lawsuit from Defendant National Union Fire Insurance Company of Pittsburgh, Pa. ("National Union"). Doc. 6, Am. Compl. ¶¶ 6–23. National Union issued a commercial general liability policy, Policy No. GL 192-95-87 (the "Policy"), to WI Holdings Inc. ("WI"), covering the period from October 18, 2012, to October 18, 2013. Doc. 20-2, Def.'s App. 1. TTC qualified as a Named Insured under the Policy, as it was a subsidiary of WI for the duration of the Policy, and WI held more than a fifty percent ownership interest in TTC.

Doc. 22, Pl.'s Br. in Supp. of Partial Mot. for Summ. J. 2 [hereinafter "Pl.'s Br. in Supp."]; *see also* Doc. 20-1, Def.'s Br. in Supp. of Mot. for Summ. J. 1 [hereinafter "Def.'s Br. in Supp."]; Doc. 20-2, Def.'s App. 32. In the Policy, as relevant to this litigation, National Union promised to (1) pay on TTC's behalf "those sums in excess of the 'Retained Limit'[1] that [TTC] becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies"; and (2) pay a certain amount of TTC's "Allocated Loss Adjustment Expenses" ("ALAE"), depending on National Union's obligation to pay damages under the Policy. Doc. 20-2, Def.'s App. 44–45. ALAE include costs incurred for litigation, such as attorney's fees and "fees for service of process and court costs and court expenses." *Id.* at 47. National Union reserved the right, but did not owe a duty, to defend covered lawsuits filed against TTC. *Id.* at 44.

In September 2013, EPMP, Ltd. ("EPMP"), and SandCan, LLC ("SandCan"), filed a lawsuit against TTC, alleging that it was responsible for the destruction of their "specialized shipping container" during testing to obtain "a certification and type approval for a non-pressurized container designed to haul, store[,] and deliver sand." Doc. 20-2, Def.'s App. 70–71. EPMP and SandCan alleged that "[t]he testing was conducted by [TTC] on January 21, 22[,] and 23, 2013," and that the application of excessive weight during the testing "destroyed the container and resulted in a failed inspection." *Id.* at 70. A third party "identif[ied] the applicable standards, create[d] an appropriate testing agenda for certification and type approval of the SandCan container[,] and supervise[d] the testing," but TTC allegedly conducted the test itself. *Id.*

---

[1] The "Retained Limit" is a ceiling amount that TTC is obligated to pay before National Union's obligation to pay under the Policy kicks in. Here, the Retained Limit was $100,000. Doc. 20-2, Def.'s App. 45.

The parties agree that WI and TTC notified National Union of the lawsuit, and that National Union did not provide a defense on the grounds that the Policy did not cover the underlying events. Doc. 20-1, Def.'s Br. in Supp. 3; Doc. 22, Pl.'s Br. in Supp. 7. National Union relies on Policy exclusion j.(4), which excludes damage to "[p]ersonal property in the care, custody[,] or control of the insured," for its denial of coverage. Doc. 20-2, Def.'s App. 8; Doc. 20-1, Def.'s Br. in Supp. 3, 7–10. TTC ultimately prevailed in the lawsuit against EPMP and SandCan, incurring costs of $352,660.57. Doc. 17, Joint Stipulation. It now seeks to recover a portion of those costs as ALAE under the Policy, and has sued for breach of contract, declaratory relief, and attorneys' fees. Doc. 6, Am. Compl. ¶¶ 16–23. National Union moves for summary judgment on all claims, while TTC seeks summary judgment solely on its breach of contract and declaratory judgment claims. Doc. 20, Def.'s Mot. for Summ. J.; Doc. 21, Pl.'s Partial Mot. for Summ. J. The Court now considers both motions.

## II.

## LEGAL STANDARD

Summary judgment is appropriate when the pleadings and record evidence, taken as a whole, show that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56; *Access Mediquip L.L.C. v. UnitedHealthcare Ins. Co.*, 662 F.3d 376, 378 (5th Cir. 2011). Only disputes about material facts preclude a grant of summary judgment, and "the substantive law will identify which facts are material." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment must be entered against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The burden is on the movant to prove that no genuine issue of material fact exists. *Latimer v. SmithKline & French Labs.*, 919 F.2d 301, 303 (5th Cir. 1990). To meet this burden, the movant must identify "those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323 (internal quotation marks omitted). Once the movant has met its burden, the non-movant must show that summary judgment is not appropriate. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). "This burden is not satisfied with 'some metaphysical doubt as to material facts,' by 'conclusory allegations,' by 'unsubstantiated assertions,' or by only a 'scintilla' of evidence." *Id.* (internal citations omitted). Instead, the non-moving party must "come forward with specific facts showing that there is a *genuine issue for trial*." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotation marks omitted).

A non-movant may not simply rely on the Court to sift through the summary judgment record to find a fact issue, but must instead point to specific evidence in the record and articulate precisely how that evidence supports the challenged claim. *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998). Thus, the non-moving party must show that the evidence is sufficient such that a reasonable jury could return a verdict for the non-movant. *Munoz v. Orr*, 200 F.3d 291, 302 (5th Cir. 2000). The Court will not make credibility determinations, weigh the evidence, or draw inferences, but instead confines its inquiry to facts material under the governing legal standard. *Anderson*, 477 U.S. at 255.

## III.

## ANALYSIS

As a preliminary matter, the Court must determine what evidence it may consider in deciding

the parties' motions. TTC and National Union agree that the so-called "eight corners rule," which limits the Court's inquiry to the Policy and the complaint in the underlying lawsuit, applies here. Doc. 20-1, Def.'s Br. in Supp. 8; Doc. 22, Pl.'s Br. in Supp. 13–15. As explained more fully below, however, the parties are mistaken—the eight corners rule does not control this dispute. Because the parties have not provided or addressed any extrinsic evidence, the Court concludes that they should be given leave to re-file their motions for summary judgment to do so.

A.     *The Eight Corners Rule Does Not Apply*

Under Texas law, the eight corners rule dictates that "an insurer's duty to defend is determined by the third-party plaintiff's pleadings, considered in light of the policy provisions, without regard to the truth or falsity of those allegations." *GuideOne Elite Ins. Co. v. Fielder Rd. Baptist Church*, 197 S.W.3d 305, 308 (Tex. 2006). This case does not involve a duty to defend, but the parties concur that extension of this rule to cover reimbursement duties is warranted. The Court disagrees, finding that neither the rule itself nor the case cited by the parties commands such a result.

1.     The Eight Corners Rule

In its modern formulations, the eight corners rule often resembles an immutable rule of law. *See, e.g., id.* But the rule's genesis paints a different picture. One of the earliest articulations of the rule is found in *Heyden Newport Chemical Corp. v. Southern General Insurance Co.*, 387 S.W.2d 22 (Tex. 1965). In that case, the plaintiff corporation had been sued in an underlying action for the negligence of its alleged agent's employee. *Id.* at 23–24. After defending the underlying suit, the corporation and its insurer sought to recover the cost of the defense from the agent's insurer. *Id.* at 24. Under the agent's insurance policy, the term "insured" included "any person or organization legally responsible for the use [of the automobile causing the bodily injury]." *Id.* The corporation

sought coverage under the policy on the basis of the underlying allegations (i.e., that the corporation was the agent's principal), but the agent's insurer denied coverage based on the corporation's statement that it had no agency relationship with the alleged agent. *Id.*

The Texas Supreme Court held that the agent's insurer's duty to defend should be determined solely from "the allegations of the complainant . . . considered in the light of the policy provisions without reference to the truth or falsity of such allegations and without reference to what the parties know or believe the true facts to be, or without reference to a legal determination thereof." *Id.* This was not a freestanding rule, however—rather, the court based its decision on the insurance policy itself, where the agent's insurer had committed to defending "any suit against the insured alleging damages within the terms of the policy even though such suit may have been groundless, false or fraudulent." *Id.* at 25 (quoting *Md. Cas. Co. v. Moritz*, 138 S.W.2d 1095, 1097 (Tex. Civ. App.—Austin 1940, writ ref'd)). In other words, the eight corners rule was merely a means of enforcing a contractual bargain, rather than a rule of construction unto itself.

This understanding of the rule is consistent with more modern decisions. In *GuideOne Elite*, for example, the Texas Supreme Court stated that the "eight corners" moniker derives "from the fact that only two documents are *ordinarily* relevant to the determination of the duty to defend: the policy and the pleadings of the third-party claimant." 197 S.W.3d at 308 (emphasis added). The modifier "ordinarily" leaves room, of course, for situations in which other evidence might be relevant to determining a duty to defend. Such a situation arose in *Pendergest-Holt v. Certain Underwriters at Lloyd's of London*, 600 F.3d 562 (5th Cir. 2010), where the Fifth Circuit refused to apply the eight corners rule to an insurer's duty to advance defense costs. The policy in that case obligated the insurer to pay such costs "until it is determined that the alleged act or alleged acts did in fact occur,"

which "contemplate[d] the use of extrinsic evidence in making the [duty to advance defense costs] determination." *Id.* at 574. The court concluded that the parties had displaced the eight corners rule in favor of an obligation dependent upon extrinsic evidence. *Id.* In other words, the rule's application was contingent upon the contractual terms.

The case cited by the parties, *Basic Energy Services, Inc. v. Liberty Mutual Insurance Co.*, 655 F. Supp. 2d 666 (W.D. Tex. 2009),[2] is not to the contrary. There, the court applied the eight corners rule to an insurer's duty to reimburse defense costs. *Id.* at 673–74. But the court based this decision on the contract itself: it found "no expressed intent to delay reimbursement of ALAE; rather, the endorsement contain[ed] a blanket statement that it will reimburse after the self-insured amount is reached." *Id.* Thus, the rule applied because the contract itself made it clear that extrinsic evidence was not relevant to the insurer's duty to reimburse.

The lesson of these cases is that the Court should not blindly apply the eight corners rule, but should instead consult the parties' contract to determine what evidence is relevant. It is to this determination that the Court now turns.

2. The Policy

The parties' contract—the Policy—lays out National Union's duty to reimburse TTC for ALAE. Doc. 20-2, Def.'s App. 45. Although this duty is written as an obligation on TTC's part to pay for ALAE up to a certain amount, it is appropriate to categorize it as a reimbursement duty because the amount of ALAE that TTC must pay—and consequently, the amount that National Union owes—depends upon the outcome of the underlying case. If National Union is not required

---

[2] The court later vacated this order.

to pay damages under the Policy, then it is responsible for half of the ALAE exceeding the Retained Limit. *Id.* Conversely, if National Union is obligated to pay damages in the underlying suit, it is responsible for a percentage of the ALAE "determined by dividing the 'Retained Limit' paid by the total damages paid, subject to the Limits of Insurance." *Id.* Accordingly, National Union's liability for ALAE can only be determined once its obligation to pay damages is ascertained (i.e., after the conclusion of the underlying lawsuit). By that point, TTC will have already paid the ALAE, so National Union could only fulfill its commitment by reimbursing the covered expenses.

This method of calculation also necessarily requires resort to evidence extrinsic to the Policy and the underlying complaint. Namely, National Union must account for its indemnity obligations arising from the underlying suit, which itself requires resort to an "actual facts" analysis. *See GuideOne Elite Ins. Co.*, 197 S.W.3d at 310 ("[T]he facts actually established in the underlying suit control the duty to indemnify."). As a result, the Policy's "terms contemplate the use of extrinsic evidence in making the [reimbursement] determination." *Pendergest-Holt*, 600 F.3d at 574. Because "the parties chose—in plain language—to displace [the eight corners rule] and to provide for the use of extrinsic evidence," the Court will "give effect to those bargained-for choices," and will not apply the eight corners rule. *Id.*

B.   *Leave to Re-file*

The Court has determined that evidence extrinsic to the Policy and the allegations in the underlying lawsuit is relevant to determining National Union's duty to reimburse TTC for its ALAE. The parties, on the other hand, have not provided any such evidence, and have only made arguments premised on the applicability of the eight corners rule. Although Local Rule 56.2(b) limits parties to one motion for summary judgment each, the Court believes that the circumstances warrant

allowing TTC and National Union to re-file their motions to account for the Court's decision that the eight corners rule does not apply to this case. Therefore, the Court grants the parties leave to re-file their motions on or before **April 6, 2016**.

### IV.

### CONCLUSION

Based on the foregoing, the Court **DENIES** National Union's Motion for Summary Judgment (Doc. 20) and TTC's Partial Motion for Summary Judgment (Doc. 21) **without prejudice**, and **GRANTS** both parties **leave to re-file** their motions on or before **April 6, 2016**.

**SO ORDERED.**

**SIGNED: March 16, 2016**.

_____
JANE J. BOYLE
UNITED STATES DISTRICT JUDGE