UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| TEXAS TRAILER CORPORATION, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 3:15-CV-2453-B |
| | § | |
| NATIONAL UNION FIRE INSURANCE | § | |
| COMPANY OF PITTSBURGH, PA, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court are (1) Defendant's Motion for Summary Judgment (Doc. 41), and (2) Plaintiff's First Amended Partial Motion for Summary Judgment (Doc. 43).[1] For the reasons that follow, the Court **GRANTS** Defendant's Motion and **DENIES** Plaintiff's.

## I.

## BACKGROUND[2]

This case concerns an insurance coverage dispute between the insured, Plaintiff Texas Trailer Corporation ("TTC"), and its insurer, Defendant National Union Fire Insurance Company of

---

[1] In its Response to Plaintiff's Partial Motion for Summary Judgment, Defendant requests that the Court strike certain evidence in Plaintiff's Appendix. Doc. 47, Br. in Supp. of Def.'s Summ. J. Resp. 1–3. Even considering the contested evidence, the Court still reaches the same outcome. Therefore, the Court **DENIES** Defendant's request to strike.

[2] The Court draws its factual account from the parties' pleadings, summary judgment briefs, and evidentiary submissions. Unless characterized as a contention by one of the parties, these facts are undisputed.

Pittsburgh, PA ("National Union").[3] TTC alleges that National Union must reimburse a portion of TTC's costs incurred in defending a lawsuit against EPMP, Ltd. ("EPMP") and SandCan, LLC ("SandCan"), involving TTC's testing of a container that EPMP and SandCan designed. Doc. 6, Pl.'s First Am. Compl. ¶¶ 10, 18 [hereinafter "FAC"].

In 2012, EPMP and SandCan designed a container "to haul, store and deliver [sand] from [a] mine to [a] well site." Doc. 42-4, Def.'s App. 81. To obtain a certification for this container to be used in international shipping, EPMP and SandCan engaged the American Bureau of Shipping ("ABS") to design a testing agenda and supervise the test. *Id.* at 79–81; Doc. 45-26, Pl.'s App. 248. After ABS created the testing agenda, *see* Doc. 45-33, Pl.'s App. 334, Clint Plant Dep. 63:6–12 [hereinafter "Plant Dep."], EPMP and SandCan hired TTC to conduct the testing at TTC's facility. *See id.* at 335, Plant Dep. 65:15–68:11; *see also* Doc. 42-4, Def.'s App. 76–77.

The testing occurred over the span of three days in January 2013. *See* Doc. 45-27, Pl.'s App. 250–51; *see also* Doc. 42-5, Def.'s App. 82. Representatives from both SandCan and EPMP attended the testing, which was carried out by three TTC employees and overseen by two ABS surveyors.[4] Doc. 45-27, Pl.'s App. 250; Doc. 45-36, Pl.'s App. 413; *see also* Doc. 42-6, Def.'s App. 89, Robert Mansker Dep. 27:11–25 [hereinafter "Mansker Dep."]; Doc. 42-10, Def.'s App. 127, Rainer Raaska Dep. 15:13–15 [hereinafter "Raaska Dep."]. To facilitate the testing, TTC rented a crane, which was operated exclusively by the crane company's employees. *See* Doc. 45-12, Pl.'s App. 118; *see also* Doc.

---

[3] National Union issued a commercial general liability policy (the "Policy") to WI Holdings, Inc., TTC's parent company. *See* Doc. 42-2, Def.'s App. 1–68.

[4] The ABS surveyors' function was to observe the tests performed on the container and ensure that these tests were done correctly (i.e., in accordance with the ABS testing agenda). *See* Doc. 42-10, Def.'s App. 126, Rainer Raaska Dep. 9–21; Doc. 45-8, Pl.'s App. 38; *see also* Doc. 45-36, Pl.'s App. 413–14.

45-10, Pl.'s App. 115. During the second day of testing, the TTC employees—at the ABS surveyors' direction—applied excess weight to the container's corner castings, deforming them. Doc. 42-6, Def.'s App. 96–98, Mansker Dep. 40:24–42:15, 43:10–24; Doc. 42-8, Def.'s App. 110, James Roe Dep. 22:20–24 [hereinafter "Roe Dep."]; Doc. 45-27, Pl.'s App. 251; Doc. 45-29, Pl.'s App. 276, Tommy Boaz Dep. 17:2–25. Despite the damage, the parties continued testing the container. Doc. 42-9, Def.'s App. 120, Plant Dep. 90:9–15; Doc. 45-27, Pl.'s App. 251.

One of the subsequent tests—the "lateral inertia" test—called for the container to be placed on its side. Doc. 42-6, Def.'s App. 99–100, Mansker Dep. 46:12–17. As the crane was turning the container on its side, part of the container deformed, causing the seams to open; as a result, some of the sand inside poured out. Doc. 42-6, Def.'s App. 101, Mansker Dep. 49:2–5. TTC continued the test, however, until one of its employees noticed a crack in a corner casting weld while they were adding weight to the container. *See* Doc. 45-27, Pl.'s App. 251; Doc. 45-36, Pl.'s App. 416. At this point the test ended because the crack constituted a failure. Doc. 45-27, Pl.'s App. 251; Doc. 45-36, Pl.'s App. 416.

SandCan and EPMP then sued TTC for damages resulting from the failed test (the "Underlying Suit"). *See* Doc. 45-19, Pl.'s App. 195–99. TTC notified National Union of the lawsuit, but National Union declined to exercise its right to provide a defense based on its conclusion that the Policy did not cover the damage at issue. Doc. 45-3, Pl.'s App. 16–18. TTC ultimately prevailed in the Underlying Suit, where the jury found that only ABS had been negligent. *See* Doc. 45-20, Pl.'s App. 202–17; Doc. 45-22, Pl.'s App. 240. Now, TTC seeks to recover a portion of its "Allocated Loss Adjustment Expenses" ("ALAE")—which includes many of its litigation costs—from National Union. *See* Doc. 6, FAC ¶¶ 10, 18; Doc. 42-2, Def.'s App. 47. Both TTC and National Union have

moved for summary judgment: TTC seeks judgment in its favor on its breach of contract and declaratory judgment claims, while National Union seeks judgment on all of TTC's claims. Doc. 41, Def.'s Mot. for Summ. J.; Doc. 43, Pl.'s First Am. Partial Mot. for Summ. J. Both parties have filed responses and replies, meaning that the Motions are ready for review. Doc. 49, Def.'s Summ. J. Resp.; Doc. 50, Pl.'s Resp. to Def.'s Mot. for Summ. J.; Doc. 55, Br. in Supp. of Def.'s Summ. J. Reply; Doc. 56, Pl.'s Reply Br.

## II.

## LEGAL STANDARD

Summary judgment is appropriate when the pleadings and record evidence, taken as a whole, show that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56; *Access Mediquip L.L.C. v. UnitedHealthcare Ins. Co.*, 662 F.3d 376, 378 (5th Cir. 2011). Only disputes about material facts preclude a grant of summary judgment, and "the substantive law will identify which facts are material." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment must be entered against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The burden is on the movant to prove that no genuine issue of material fact exists. *Latimer v. SmithKline & French Labs.*, 919 F.2d 301, 303 (5th Cir. 1990). To meet this burden, the movant must identify "those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323 (internal quotation marks omitted). Once the movant has met its burden, the non-movant must show that summary judgment is not appropriate. *Little v. Liquid*

*Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). "This burden is not satisfied with 'some metaphysical doubt as to material facts,' by 'conclusory allegations,' by 'unsubstantiated assertions,' or by only a 'scintilla' of evidence." *Id.* (internal citations omitted). Instead, the non-moving party must "come forward with specific facts showing that there is a *genuine issue for trial.*" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotation marks omitted).

A non-movant may not simply rely on the Court to sift through the summary judgment record to find a fact issue, but must instead point to specific evidence in the record and articulate precisely how that evidence supports the challenged claim. *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998). Thus, the non-moving party must show that the evidence is sufficient such that a reasonable jury could return a verdict for the non-movant. *Munoz v. Orr*, 200 F.3d 291, 302 (5th Cir. 2000). The Court will not make credibility determinations, weigh the evidence, or draw inferences, but instead confines its inquiry to facts material under the governing legal standard. *Anderson*, 477 U.S. at 255.

## III.

## ANALYSIS

TTC's breach of contract and declaratory judgment claims boil down to whether the damage in this case is covered under the Policy. National Union argues that coverage is excluded because the container was personal property within TTC's "care, custody or control" at the time it was damaged. Doc. 42, Def.'s Br. in Supp. of Mot. for Summ. J. 9–13 [hereinafter "Def.'s MSJ Br."]. TTC disagrees. Doc. 44, Pl.'s Br. in Supp. of First Am. Partial Mot. for Summ. J. 16–20 [hereinafter "Pl.'s MSJ Br."]; Doc. 51, Pl.'s Br. in Supp. of Resp. 14–24 [hereinafter "Pl.'s Resp. Br."]. As explained below, National Union is correct—the Policy does not cover the damage to the container because

it was in TTC's care, custody, or control at the time it was damaged.

A.      *TTC's Breach of Contract and Declaratory Judgment Claims*

It is undisputed that, because TTC prevailed in the Underlying Suit, National Union did not incur an obligation to pay damages on TTC's behalf. Therefore, under the Policy, TTC is "responsible for all [ALAE] up to the applicable 'Retained Limit' plus 50% of all remaining [ALAE]." Doc. 45-18, Pl.'s App. 171. The "Retained Limit," which applies "only to damages for 'occurrences' or offenses *covered under this Policy*, is $100,000 per 'occurrence' or offense." *Id.* (emphasis added). As this language makes clear, only damages incurred as a result of covered events count toward the Retained Limit. Thus, if the damage to the container is excluded from coverage, then none of TTC's expenses in defending the Underlying Suit counted toward the Retained Limit, meaning that TTC would not be entitled to any reimbursement. Accordingly, the Court must first determine whether the Policy covered the damage to the container.

As a contract, an insurance policy is "subject to the same rules of construction as [an] ordinary contract[]." *Archon Invs., Inc. v. Great Am. Lloyds Ins. Co.*, 174 S.W.3d 334, 338 (Tex. App.—Houston [1st Dist.] 2005, pet. denied). "It is well settled that insurance policies should be construed in favor of the insured; however, this rule does not apply when the term to be construed is unambiguous and susceptible of only one construction." *Id.* "In such a case, [a court must] give the words in the policy their plain meaning." *Id.* Here, neither party has argued that the "care, custody or control" provision is ambiguous, and the Court concludes that it is not. Thus, construction of the term is "a question of law for the court." *See Tawes v. Barnes*, 340 S.W.3d 419, 425 (Tex. 2011).

1.      <u>"Care, Custody or Control" vs. "Physical Control"</u>

National Union argues that the incident underlying this case falls within Policy exclusion

j.(4), which excludes coverage for "'[p]roperty damage' to . . . [p]ersonal property in the care, custody or control of the insured." Doc. 45-18, Pl.'s App. 134.[5] According to National Union, the container was within TTC's "care, custody or control" because it conducted the testing. Doc. 42, Def.'s MSJ Br. 10–13. In urging its position, National Union relies primarily on *Blue Marlin Construction Co., Inc. v. General Star Indemnity Co.*, 16 F. Supp. 2d 762 (S.D. Tex. 1998). In that case, the plaintiff sued its insurer when the latter refused to indemnify it for damage to a "vibro hammer" it had used as part of a pile driving operation. *Id.* at 763. The court held that the damage was excluded under the insurance policy's "care, custody or control" provision[6] because the plaintiff "had immediate supervision of the vibro hammer, and it was a necessary element of [the p]laintiff's work." *Id.* at 766. This was true even though the damage occurred while the plaintiff was moving the hammer according to the instructions of the party who had leased it. *Id.* National Union contends that this case present an analogous situation.

TTC, on the other hand, argues that the exclusion does not apply because it tested the container according to ABS's agenda and a third party operated the crane that shifted the container before TTC's employee noticed the damage. Doc. 51, Pl.'s Br. in Supp. of Resp. 14–24 [hereinafter "Pl.'s Resp. Br."]. TTC believes that National Union's reliance on *Blue Marlin* is misplaced because (1) no state or federal district court in Texas has ever cited it, and (2) *Blue Marlin*'s facts differ from those in this case. *Id.* at 22–24. Rather, TTC suggests that *SnyderGeneral Corp. v. Century Indemnity*

---

[5] The parties have not argued that the container is not "personal property" within the Policy's meaning, or that the damage to it does not qualify as "property damage," so the Court will focus only on whether it was in TTC's "care, custody or control" at the time of the damage.

[6] Identical in relevant respects to the provision at issue here. *Blue Marlin*, 16 F. Supp. 2d at 764.

*Co.*, 113 F.3d 536 (5th Cir. 1997), controls here. Doc. 51, Pl.'s Resp. Br. 15, 23. *SnyderGeneral* involved a manufacturer that contaminated local groundwater, prompting a major cleanup effort. 113 F.3d at 537–38. The manufacturer then sought to recover the cost of the cleanup from its insurer, which denied the claim based on a similar—but not identical—"care, custody or control" provision. *Id.* at 538, 539 n.8. The Fifth Circuit affirmed the district court's conclusion that coverage was not excluded because the insurer had not shown that the manufacturer "totally and physically used or controlled the entire pool of groundwater." *Id.* at 539. It is this "total[] and physical[] . . . control[]" language that TTC hangs its hat on.

The Fifth Circuit drew this language from *Goswick v. Employers' Casualty Co.*, 440 S.W.2d 287 (Tex. 1969), *see SnyderGeneral*, 113 F.3d at 539 n.10, where the Texas Supreme Court interpreted a provision that excluded coverage for "property in the care, custody or control of the insured or property as to which the insured for any purpose is exercising physical control." *Goswick*, 440 S.W.2d at 289. The policy at issue thus considered "care, custody or control" and "physical control" to be distinct conditions, and the Texas Supreme Court followed suit. It explained that property within an insured's "control" is limited "to the particular object of the insured's work, usually personalty, and to other property which he *totally and physically manipulates*." *Id.* (emphasis added). Property is within an insured's "care, custody or control," on the other hand, when it is "under the immediate supervision of the insured and is a necessary element of the work involved." *Id.* at 290. Thus, proof of total and physical manipulation is required only where the policy exclusion rests on the insured's having "physical control" over the damaged property. When an exclusion simply requires that property have been in the insured's "care, custody or control," however, the insurer need only show that the property was "under the immediate supervision of the insured and

[wa]s a necessary element of the work involved."

*SnyderGeneral* is consistent with this interpretation. There, the exclusion applied to "property damage to . . . property in the care, custody or control of the insured as to which the insured is for any purpose exercising physical control." 113 F.3d at 539 n.8. Thus, the exclusion required both that the damaged property have been in the "care, custody or control of the insured" *and* that the insured have been "exercising physical control" over the property. Because the insurer could not show that the insured "totally and physically used or controlled the entire pool of groundwater," it could not prove "physical control," and thus the exclusion did not apply. *Id.* at 539. This conclusion does not bear on the present case, though, because the Policy's exclusion only requires that the container have been in TTC's "care, custody or control," rather than its "physical control." As a result, National Union can carry its burden to prove the exclusion applies by showing that the container was under TTC's "immediate supervision" and it was "a necessary element" of TTC's work. *See Goswick*, 440 S.W.2d at 290.

### 2.    The Container Was Within TTC's "Care, Custody or Control"

Based on the parties' evidence, the Court has no trouble concluding that the container was within TTC's "care, custody or control" when it was damaged. EPMP and SandCan hired TTC to conduct the testing at TTC's facility, using TTC's equipment. ABS may have designed the tests, but TTC actually performed them. This is enough to constitute "immediate supervision." The ABS surveyors' oversight is not relevant to the analysis, because the exclusion focuses solely on the "care, custody or control" of the *container*, rather than the guidelines under which it was manipulated. *See*

*Blue Marlin*, 16 F. Supp. 2d at 766;[7] *see also Hi-Port, Inc. v. Am. Int'l Specialty Lines Ins. Co.*, 22 F. Supp. 2d 596, 597, 599 (S.D. Tex. 1997) (finding that tainted antifreeze was in insured's "care, custody or control" when it was prepared at insured's facility, even though insured prepared it "in accordance with [a third party's] proprietary formula and blending procedure"). Furthermore, the container was not only *a* "necessary element of the work involved"—it was *the* necessary element. The whole point of TTC's job was to test the container. Without it, there would have been no job at all. Therefore, the container was within TTC's "care, custody or control" when it was damaged, meaning that exclusion j.(4) applies.

The Court finds additional support for this conclusion in cases concerning property damaged by an insured hired to conduct repairs or make modifications. When faced with these cases, courts have found that the property was within the insured's "care, custody or control" at the time of the damage. For example, in *Goswick*, the insured was hired to change out an underground oil pump. 440 S.W.2d at 287–88. During the repairs, gas in the well ignited and significantly damaged the pump and the well itself. *Id.* The court held that the pump and its accessories were within the insured's "care, custody or control," and thus the damage to them was excluded from coverage. *Id.* at 290. Similarly, in *AIU Insurance Co. v. Mallay Corp.*, 938 F. Supp. 407 (S.D. Tex. 1996), the court found that a turbine was in the "care, custody or control" of the insured to whom the owner had sent it to be burnished. *Id.* at 408–09, 410–11. Consequently, the insured could not recover the costs of the

---

[7] Despite TTC's protestations, the Court finds *Blue Marlin* persuasive. The mere fact that a case has not been cited does not mean that it was wrongly decided. Furthermore, TTC's attempt to distinguish the facts of this case also falls flat. Although TTC did not own or operate the crane that moved the container, it nonetheless directed the crane's operation, and the operator had no independent authority to take any action with respect to the container. At the very least, TTC retained "immediate supervision" over the crane's operations and, by extension, the container.

turbine's damage from its insurer. *Id.* at 411. Like TTC, the insureds in these cases took temporary possession of the property for the purpose of performing specified work on it, and so held it in their "care, custody or control" during that time. There is no principled reason to reach a different outcome in this case.

Because the damage to the container occurred while it was within TTC's "care, custody or control," it is excluded from coverage under the Policy. Consequently, TTC's costs of defending the Underlying Suit did not count toward the Retained Limit, meaning that National Union is not obligated to reimburse TTC's ALAE incurred in that lawsuit.

B.    *TTC's Attorney's Fees Claim*

TTC also seeks attorney's fees for its breach of contract and declaratory judgment claims under Tex. Civ. Prac. & Rem. Code Chapters 37 and 38, as well as 28 U.S.C. § 2201 *et seq.* Doc. 6, FAC ¶ 23. Texas's Uniform Declaratory Judgment Act (UDJA) permits a court to award "necessary attorney's fees as are equitable and just" in a declaratory judgment action, Tex. Civ. Prac. & Rem. Code § 37.009, and a prevailing party may also recover attorney's fees in a breach of contract action, Tex. Civ. Prac. & Rem. Code § 38.001(8). For the reasons already explained, however, TTC cannot prevail on either its declaratory judgment or breach of contract claim, and so is not entitled to attorney's fees for either. Furthermore, the UDJA is procedural, and thus does not apply in federal proceedings. *See Utica Lloyd's of Tex. v. Mitchell*, 138 F.3d 208, 210 (5th Cir. 1998). Accordingly, National Union is entitled to judgment as a matter of law on this claim as well.

## IV.

## CONCLUSION

Based on the foregoing, the Court **GRANTS** National Union's Motion for Summary

Judgment (Doc. 41) and **DENIES** TTC's First Amended Partial Motion for Summary Judgment (Doc. 43).


SO ORDERED.

SIGNED: June 28, 2016.


JANE J. BOYLE
UNITED STATES DISTRICT JUDGE